JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Nicholas Wilson et al. | Raytheon Technologies Corp. et al. |

| (b) County of Residence of First Listed Plaintiff Arapahoe County, CO | County of Residence of First Listed Defendant Hartford County, CT |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
|  | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| See attached complaint. |  |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **INTELLECTUAL PROPERTY RIGHTS** | ☒ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. 1

Brief description of cause:
Employees' class action for antitrust violations

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE Sarala V. Nagala

DOCKET NUMBER 3:21-cv-01657

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| Jan 13, 2022 | /s/ Joshua R. Goodbaum (ct28834) |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NICHOLAS WILSON and ALEX SCALES, individually and on behalf of all others similarly situated, | Case No.: 3:22-cv-00062 |
| **Plaintiffs,** | |
| v. | **CLASS ACTION COMPLAINT** |
| RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION; QUEST GLOBAL SERVICES-NA, INC.; BELCAN LLC; CYIENT, INC.; PARAMETRIC SOLUTIONS, INC.; AGILIS ENGINEERING, INC.; MAHESH PATEL; ROBERT HARVEY; HARPREET WASAN; STEVEN HOUGHTALING; TOM EDWARDS; GARY PRUS; and FRANK O'NEILL, | **JURY TRIAL DEMANDED** |
| | **January 13, 2022** |
| **Defendants.** | |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

JURISDICTION AND VENUE ..................................................................................5

THE PARTIES............................................................................................................5

     A.     Plaintiffs........................................................................................5

     B.     Defendants ....................................................................................6

I.     FACTUAL ALLEGATIONS ..........................................................................9

     A.     The Aerospace Industry Labor Market ......................................9

     B.     The Conspiracy to Restrict Hiring and Recruiting Among Suppliers ..................12

     C.     The Conspiracy to Further Restrict Hiring and Recruiting Between Pratt & Whitney and QuEST ............................................17

           1.     Pratt & Whitney agreed not to recruit or hire QuEST employees until they had worked for QuEST for at least two years............................17

           2.     Pratt & Whitney and QuEST agreed on hiring freezes. .............................18

     D.     The Effects of the No-Poach Conspiracy.................................19

II.     EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT ......................22

III.     CLASS ACTION ALLEGATIONS ..............................................................24

CLAIM FOR RELIEF ...............................................................................................27

PRAYER FOR RELIEF ............................................................................................27

DEMAND FOR JURY TRIAL .................................................................................28

Plaintiffs Nicholas Wilson and Alex Scales bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all engineers and other skilled workers employed by QuEST Global Services-NA, Inc. ("QuEST"), Belcan Engineering Group, LLC ("Belcan"), Cyient, Inc. ("Cyient"), Agilis Engineering, Inc. ("Agilis"), and Parametric Solutions, Inc. ("Parametric Solutions") (collectively the "Supplier Defendants") and Raytheon Technologies Corporation, Pratt & Whitney Division ("Pratt & Whitney") (together with the Supplier Defendants, "Defendants").

## **INTRODUCTION**

1.      This antitrust action concerns the rights of employees to free and fair labor markets.  "[W]orkers, like consumers, are entitled to the benefits of a competitive market."[1]  But for more than a decade, Defendants—among the largest U.S.-based aerospace engineering firms that design, manufacture, and service aerospace products for civil and military applications— secretly agreed to restrict their competition for the recruitment and hiring of aerospace engineers and other skilled workers among and between their firms.  Defendants entered into this secret agreement so they could pay these highly-skilled employees, many of whom reside in the State of Connecticut, less than they would have to pay in a competitive market.  Plaintiffs bring this complaint to seek redress for the harm Defendants inflicted on their employees.

2.      Aerospace engineering firms like Defendants conduct much of their work through a system of "outsource engineering."  In this system, Pratt & Whitney contracts with supplier firms—such as the Supplier Defendants—to complete projects using the supplier firm's own employees and resources.  The supplier firm pays the salary and benefits for workers assigned to

---

[1]   U.S. Dep't of Justice, Division Update Spring 2018 (2018), https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements (last visited Jan. 12, 2022).

the project, and the supplier firm is then paid by the engineering contractor once work is completed.

3.      Attracting, hiring, and retaining skilled employees and engineers is a key to success in the aerospace engineering industry, especially for firms competing to secure contracts for outsource engineering projects.  The work done on these projects is highly specialized and technical, and the employees for which firms would normally compete require extensive education and training to do their jobs well.  Because national defense projects are an important source of business for Defendants, many of their employees must also be able to obtain and maintain government security clearances.  Many aerospace engineering firms—including Defendants—actively recruit armed-services veterans for this reason.

4.      Demanding requirements and high barriers to entry mean that qualified candidates for employment with Defendants are scarce.  In a competitive market, the combination of a low supply of candidates and high demand for their skills would lead to higher compensation and better benefits as firms compete to lure top workers away from competitors and convince their own workers to reject offers from other firms.

5.      Defendants, however, found a way to avoid having to compete with each other to pay their employees what they are worth.  Beginning in 2011, Defendants explicitly agreed not to hire or recruit each other's engineers and other skilled workers.  The purpose and result of this unlawful agreement was so Defendants could artificially depress their own labor costs while depriving workers of the compensation they would earn in a competitive marketplace not infected by unlawful collusion.

6.      The conspiracy was exposed on December 9, 2021, when the U.S. Department of Justice ("DOJ") unsealed a criminal antitrust action against Mahesh Patel, the former Director of

Global Engineering Sourcing at Pratt & Whitney.  *See* Aff. in Supp. of Criminal Compl. and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-01189 (D. Conn. Dec. 9, 2021), ECF No. 15 (the "DOJ Affidavit").  A week later, the DOJ announced the indictment of Mr. Patel and five senior executives from the Supplier Defendants, including Robert Harvey and Harpreet Wasan of QuEST, Steven Houghtaling of Belcan, Tom Edwards of Cyient, and Gary Prus of Parametric Solutions.  The DOJ alleges that these senior executives entered into and carried out the No-Poach Agreement, along with other unnamed executives. *United States v. Patel, et al.*, No. 3:21-cr-00220-VAB, ECF No. 20 (D. Conn. Dec. 16, 2021) (the "Indictment").  In announcing the indictment, Assistant Attorney General Jonathan Kanter stated that the DOJ's "investigation revealed a prolonged and widespread scheme to deprive aerospace workers of the ability to plan their own careers and earn competitive pay."[2]

7.      The conspiracy was far-reaching and enforced by a system of monitoring and reporting.  When members of the conspiracy learned that a co-conspirator was trying to compete for an already-claimed worker, they would complain to Mr. Patel, who served as the "leader and primary enforcer of the conspiratorial agreement" and the "intermediary for communications between co-conspirators."  Indictment ¶ 22.  Mr. Patel would then dissuade wayward conspirators from hiring a candidate, reminding them that "[w]e must not poach each other [sic] partners [sic] employee."  *Id.* ¶ 22(d).  Once alerted, Mr. Patel directly requested that co-conspirators "not extend" offers to certain candidates.  *Id.* ¶ 23(b).  Other conspirators documented discussions with Mr. Patel about "new policy/guidelines" to establish minimum

---

[2]  *See* "Six Aerospace Executives and Managers Indicted for Leading Roles in Labor Market Conspiracy that Limited Workers' Mobility and Career Prospects" (Dec. 16, 2021), https://www.justice.gov/usao-ct/pr/six-aerospace-executives-and-managers-indicted-leading-roles-labor-market-conspiracy-1 (last visited Jan. 12, 2022).

"tenure requirements" before conspirators could solicit a worker from one another for employment. *Id.* ¶ 24.

8.      Defendants' restraint on competition was expressly intended to "pre[v]ent poaching and price war[s]" over qualified candidates, which could "drive the price structure up" for Defendants.  Indictment ¶ 27(b–c).  Defendants openly discussed their mutual desire to use the conspiracy to "contain labor cost increases in our joint 'ecosystem' over time." *Id.* ¶ 27(d). Defendants boasted to each other about the money they saved through their unlawful agreement at the expense of their workers.  Pratt & Whitney even presented co-conspirators with awards for achieving "engineering cost savings" on outsource engineering projects.

9.      Defendants knew that what they were doing was wrong and illegal.  In January 2016, for example, one of the conspirators scheduled a meeting with Mr. Patel that included the agenda item: "Informal poaching agreement between outsource suppliers.  Recent Apple lawsuit because these agreements are illegal."  DOJ Aff. ¶ 36.  The following year, a Human Resources Director employed by one of the Defendants raised concerns that "there is an anti-trust issue by us turning people away solely based on their previous employer." *Id.* ¶ 37.  After speaking with Mr. Patel, the Director reported that Mr. Patel "understands our concern with antitrust compliance [sic], however, he still requested that our recruiters not speak with applicants who are current[ly] employed" by another co-conspirator. *Id.*

10.      And because they knew it was illegal, Defendants took pains to keep their conspiracy secret and to hide it from their victims.  In one email, for example, a conspirator advised that "[f]ollowing [Mr. Patel's] previous counsel, I am not going into detail in writing on this subject." *Id.* ¶ 42.

11.     Defendants' unlawful actions harmed their employees in ways that will persist for years to come.  The conspiracy interfered with the ability of workers to plan their careers and to find employment that best suited their skills and interests.  It also depressed these workers' wages and compensation for the better part of a decade, and future employers may use these artificially low salary histories when deciding compensation.  Defendants' conspiracy has already cost employees many millions of dollars they lost the opportunity to earn, and that damage is likely to compound as their careers continue.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.     This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22; Federal Rule of Civil Procedure 4(h)(1)(A); and the Connecticut long-arm statute because each Defendant resides in or has its principal place of business in Connecticut, employed individuals in Connecticut during the Class Period, and/or has had substantial contacts with Connecticut in furtherance of the conspiracy.

14.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### A.     Plaintiffs

15.     Plaintiff Nicholas Wilson is a citizen and resident of the State of Colorado. Mr. Wilson was employed as an Engineer for Cyient from September 2018 until May 2020,

working specifically on Pratt & Whitney projects.  During his employment with Cyient, Mr. Wilson was located in East Hartford, Connecticut.  Mr. Wilson was injured in his business or property by reason of the violation alleged herein.

16.      Plaintiff Alex Scales is a citizen and resident of the State of Colorado.  Mr. Scales was employed as a Mass Properties Engineer by Cyient from June 2016 until May 2020, working exclusively worked on projects for Pratt & Whitney.  During his employment with Cyient, Mr. Scales was located in East Hartford, Connecticut.  Mr. Scales was injured in his business or property by reason of the violation alleged herein.

### B.   **Defendants**

17.      Pratt & Whitney is a subsidiary of Raytheon Technologies Corporation and is incorporated in Delaware with its principal place of business in East Hartford, Connecticut.  Pratt & Whitney is one of the largest aerospace engine design, manufacture, and service companies in the United States.  During the Class Period, Pratt & Whitney and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.  Pratt & Whitney is "Company A" as alleged in the DOJ Affidavit.  *See* DOJ Aff. ¶ 5.

18.      QuEST Global Services-NA, Inc. ("QuEST") is incorporated in Ohio with its principal place of business in East Hartford, Connecticut.  During the Class Period, QuEST and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.  QuEST is identified as "Company B" in the DOJ Affidavit.  *See* DOJ Aff. ¶ 6(a).

19.      Belcan, LLC ("Belcan") is incorporated in Ohio with its principal place of business in Windsor, Connecticut.  During the Class Period, Belcan and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries,

and/or benefits to Class members in the United States.  Belcan is identified as "Company C" in the DOJ Affidavit.  *See* DOJ Aff. ¶ 6(b).

20.     Cyient, Inc. ("Cyient") is incorporated in California with its principal place of business in East Hartford, Connecticut.  Prior to 2014, Cyient was known under a different corporate name, Infotech Enterprises, Limited.  During the Class Period, Cyient and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.  Cyient is identified as "Company D" in the DOJ Affidavit.  *See* DOJ Aff. ¶ 6(c).

21.     Parametric Solutions, Inc. ("Parametric Solutions") is incorporated in Florida with its principal place of business in Jupiter, Florida.  During the Class Period, Parametric Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.  Parametric Solutions is identified as "Company E" in the DOJ Affidavit.  *See* DOJ Aff. ¶ 6(d).

22.     Agilis Engineering, Inc. ("Agilis") is incorporated in Florida with its principal place of business in Palm Beach Gardens, Florida.  During the Class Period, Agilis and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.  Agilis is identified as "Company F" in the DOJ Affidavit.  *See* DOJ Aff. ¶ 6(e).

23.     Mahesh Patel is a natural person who resides in Glastonbury, Connecticut.  Mr. Patel was the Manager and Director of the Pratt & Whitney unit that managed the relationship between Pratt & Whitney and its suppliers.  He was the highest-ranking employee within that unit and managed a team of associates from his office in East Hartford, Connecticut.  Mr. Patel

was the main enforcer of Defendants' illegal agreement and served as an intermediary for communications between co-conspirators.  Mr. Patel left Pratt & Whitney in March 2020.

24.     Robert (Bob) Harvey is natural person residing in Farmington, Connecticut. Beginning in 2010, Mr. Harvey worked for QuEST as Senior Vice President, then President-Strategic Accounts, and, as of 2019, President-Global Business Head.  Mr. Harvey worked principally from an office in East Hartford, Connecticut.  From 1998 to 2000, Mr. Harvey worked for Pratt & Whitney as a Senior Vice President.  Mr. Harvey is identified in the DOJ Affidavit as "Co-Conspirator 1."  *See* DOJ Aff. ¶ 8(a).

25.     Harpreet Wasan is a natural person residing in South Glastonbury, Connecticut. Beginning in early 2015, Mr. Wasan was Vice President/Strategic Client Partner at QuEST, and worked principally from offices in East Hartford, Connecticut and Tokyo, Japan.  He left QuEST in early 2021.  Prior to his roles at QuEST, Mr. Wasan worked at Pratt & Whitney for approximately ten years.  Mr. Wasan is identified in the DOJ Affidavit as "Co-Conspirator 3." *See* DOJ Aff. ¶ 8(c).

26.     Steven Houghtaling is a natural person and resident of Connecticut.  In 2013, he began working for Belcan as a General Manager, and was promoted to Vice President in 2015. Since 2019, he has served as Belcan's Senior Vice President, working principally from an office in Windsor, Connecticut.  Mr. Houghtaling is identified in the DOJ Affidavit as "Co-Conspirator 5."  *See* DOJ Aff. ¶ 8(e).

27.     Tom Edwards is a natural person and resident of Connecticut.  Starting in or around 2010, Mr. Edwards was employed at the company now known as Cyient, and since around 2013, has been President for Cyient's North America operations.  He worked principally

from an office in East Hartford, Connecticut.  Mr. Edwards is identified in the DOJ Affidavit as "Co-Conspirator 6."  *See* DOJ Aff. ¶ 8(f).

28.     Gary Prus is a natural person and resident of Florida.  Beginning at least as early as 2015, Mr. Prus was Chief Operating Officer/Executive Vice President and part owner of Parametric Solutions, and worked principally from an office in Jupiter, Florida.  Prior to his employment with Parametric Solutions, Mr. Prus worked for 18 years at Pratt & Whitney.  Mr. Prus is identified in the DOJ Affidavit as "Co-Conspirator 7."  *See* DOJ Aff. ¶ 8(g).

29.     Frank O'Neill is a natural person and resident of Florida.  He has served as Agilis's President and CEO since 1993, working primarily from an office in Palm Beach Gardens, Florida.  Mr. O'Neil is identified in the DOJ Affidavit as "Co-Conspirator 8."  *See* DOJ Aff. ¶ 8(h).

## I.     FACTUAL ALLEGATIONS

### A.     The Aerospace Industry Labor Market

30.     The U.S. aerospace industry is the largest aerospace industry in the world and continues to grow as space and defense-related sectors develop.  Despite COVID-19's impact on commercial aviation, the United States aerospace and defense industry reported nearly $700 billion in revenue in 2020.[3]

---

[3]   PricewaterhouseCoopers, *Global Aerospace and Defense: Annual Industry Performance and Outlook* at 4 (2021), https://www.pwc.com/us/en/industrial-products/publications/assets/pwc-aerospace-defense-annual-industry-performance-outlook-2021.pdf.

31.     According to the United States Bureau of Labor Statistics ("BLS"), as of 2020, there were approximately 60,000 aerospace engineers in the United States earning a mean wage of more than $120,000 per year.[4]

32.     The BLS predicts that, "[a]s space becomes more accessible, especially with developments in small satellites that have greater commercial viability, demand for aerospace engineers among businesses and government entities is expected to increase.  In addition, continued interest in drone will help to drive employment growth for these engineers."[5]

33.     Many aerospace companies participate in projects related to national security or defense, which require their engineers to access to sensitive or classified information.  As a result, engineers are often required to obtain national security clearances.  Pratt & Whitney lists the "[a]bility to obtain and maintain a US Government SECRET security clearance of higher" as a basic qualification for some of its aerospace engineering positions.[6]

34.     High barriers to entry and increasingly specialized work keep the supply of qualified aerospace engineer candidates low.  The Aerospace Industry Association's report on the aerospace workforce warned that "the industry faces impending retirements and a shortage of trained technical graduates while work and skills requirements become increasingly advanced —

---

[4]   U.S. Bureau of Labor Stats., Occupational Employment and Wages, May 2020: 17-2011 Aerospace Engineers, https://www.bls.gov/oes/current/oes172011.htm#st (last visited Jan. 12, 2022).

[5]   U.S. Bureau of Labor Stats., Occupational Outlook Handbook: Aerospace Engineers, https://www.bls.gov/ooh/architecture-and-engineering/aerospace-engineers.htm#tab-6 (last visited Jan. 12, 2022).

[6]   Pratt & Whitney, Senior Engineer — Adaptive HPC Structures — P3 (Onsite), https://careers.rtx.com/global/en/job/01485454/Senior-Engineer-Adaptive-HPC-Structures-P3-Onsite (last visited Jan. 12, 2022).

a challenging situation forecast to worse in the next decade."[7]  The same organization found that 39 percent of aerospace companies predict an "'extreme' impact on their business growth caused by the [Science, Technology, Engineering, and Mathematics] labor shortage" and that "talent shortages cost an estimated $14,000 per unfilled position."[8]

35.     In a competitive labor market, competition between numerous employers for the small pool of eligible candidates would help "actual and potential employees through higher wages, better benefits, or other terms of employment."[9]

36.     Defendant Pratt & Whitney is a major player in the aerospace industry with significant market power, employing more than 42,000 people while generating nearly $21 billion in net sales and $1.8 billion in adjusted operating profit in 2019.[10]  Engines manufactured by Pratt & Whitney power thousands of civil and military aircraft around the world, including the U.S. military's state-of-the-art F-35 Lightning II fighter jet.[11]  Pratt & Whitney claims that its "large commercial engines power nearly 30 percent of the world's mainline passenger aircraft fleet," and that "[t]hirty-four armed forces around the world use our military engines."[12]

---

[7]     Aerospace Indus. Ass'n, *The Defining Workforce Challenge in U.S. Aerospace & Defense: STEM Education, Training, Recruitment & Retention* at 2 (2016), https://www.aia-aerospace.org/wp-content/uploads/2016/09/STEM_Report_lowres_V11.pdf.

[8]     Aerospace Indus. Ass'n, *What Every Candidate Should Know About the Aerospace Workforce and STEM* at 1 (2016), https://www.aia-aerospace.org/wp-content/uploads/2016/06/AIA_Campaign_Papers_Workforce.pdf

[9]     U.S. Dep't Justice, *Antitrust Guidance for Human Resource Professionals* at 2 (2016), https://www.justice.gov/atr/file/903511/download.

[10]     United Technologies, *Annual Report 2019* at 10 (2019), https://investors.rtx.com/static-files/5612ce4a-a018-4f37-adc6-a154069a68f3.

[11]     *Id.*

[12]     Pratt & Whitney, Our Products, https://prattwhitney.com/products-and-services/products.

37.     During the Class Period, outsource engineering was one of the key sources of labor used by Pratt & Whitney to design, manufacture, and service its aerospace products.  In an outsource engineering engagement, Pratt & Whitney would issue a "Statement of Work" for a particular project, and an outsource engineering supplier would bid on the project.  Once the bid was accepted, Pratt & Whitney and the supplier would enter into an agreement for the project, and the supplier would allocate engineers and other skilled workers from among its own employees to work on the project for Pratt & Whitney.  Defendants QuEST, Belcan, Cyient, Parametric Solutions, and Agilis were among the suppliers whose employees were outsourced to Pratt & Whitney on projects during the Class Period.

38.     Increases in labor costs caused by increased wages or benefits to engineers and other skilled workers had an impact on Pratt & Whitney and its suppliers.  If a supplier increased wages or benefits to attract or retain workers, the supplier's total labor costs were increased.  That increase in labor costs, in turn, created an incentive for suppliers to bid higher prices on Pratt & Whitney projects, given that suppliers' rates for projects were based mainly on the hourly cost of labor performed by the supplier's employees on an outsource basis.

39.     In a normal competitive market, Defendants QuEST, Belcan, Cyient, Parametric Solutions, and Agilis would have competed against one another for outsource work projects from Pratt & Whitney.  And in a normal competitive labor market, these companies would have competed to recruit and hire the most talented employees by offering employees better compensation, wages, and benefits.  As explained below, however, Defendants instead entered into an illegal agreement not to compete against each other in the labor market.

### B.     The Conspiracy to Restrict Hiring and Recruiting Among Suppliers

40.     Beginning at least as early as 2011, and continuing to the present, Defendants have conspired with each other not to hire or recruit each other's employees.

41.     The conspiracy was designed to suppress the compensation of Defendants'
engineers and other skilled workers by limiting competition for these workers within the
outsource aerospace engineering industry.  The conspiracy enabled Defendants to avoid bidding
wars to attract and retain employees.  To ensure the conspiracy worked, when any Defendant
engaged in potential competition to hire or recruit aerospace engineers, Pratt & Whitney's Mr.
Patel and other conspirators attempted to stop it.  The conspiracy was successful: it suppressed
the wages, salaries, and benefits paid to Class members since at least 2011 to levels materially
lower than they would have been in a competitive market.

42.     Pratt & Whitney explicitly told the other Defendants that they should not recruit
or hire each other's employees.  For example, Mr. Patel held a dinner in December 2015 with
QuEST's Mr. Wasan, another co-conspirator employee of QuEST, and Cyient's Mr. Edwards,
where he directly told attendees that they should not poach each other's employees.  DOJ Aff.
§19.  As another example, in an email from September 2016, Mr. Patel sent a warning to Mr.
Prus, the Chief Operating Officer and part owner of Parametric Solutions, stating:  "Last time we
talked you assured me that you will not hire any [Pratt & Whitney] partners['] employee.  This
must stop, [sic] otherwise others will also start poaching your employees."  DOJ Aff. ¶ 29.
Defendants QuEST, Belcan, Cyient, Parametric Solutions, and Agilis understood that these
restrictions applied mutually among each of them, and abided by the agreement.  DOJ Aff. ¶ 16.

43.     Defendants convinced each other to abide by the no-poach conspiracy by
appealing to their joint interest in suppressing their labor costs.  For example, in a January 2017
email, Mr. Patel of Pratt & Whitney wrote Parametric Solutions and instructed:  "Please do not
hire any partners['] employee, whether they approached or you approached.  That is the only
way we can pre[v]ent poaching and price war."  And in March 2016, while discussing Pratt &

13

Whitney's hiring restrictions, Mr. Prus of Parametric Solutions wrote that "Mahesh [Patel of

Pratt & Whitney] says he does not want the salaries to increase."  DOJ Aff. ¶ 24.

44.      As another example, in April 2017, a conspirator employed by QuEST emailed

Mr. Patel to complain that Cyient had hired a QuEST employee, telling him, "This is against our

agreements with our employees and against our known expectations of Pratt & Whitney for the

cooperation of the outsource companies," and warning that if the poaching did not stop, it would

"drive the price structure up."  DOJ Aff. ¶ 25.  Mr. Patel sent the conspirator an invitation for a

"private discussion" the next day in his office with executives of QuEST and Cyient, including

Cyient's Mr. Edwards.  DOJ ¶ 25.

45.      Pratt & Whitney policed and enforced the agreement on behalf of the other

Defendants.  When one Defendant stepped out of line, another Defendant would alert Pratt &

Whitney's Mr. Patel and ask him to assist in preventing or deterring the conduct.  Mr. Patel often

obliged by reprimanding the offending Defendant.

46.      For example, in May 2016, Mr. Houghtaling of Belcan was informed by a

colleague that "[a]nother employee" had been hired by Parametric Solutions to work on an

outsourcing project.  The colleague asked Mr. Houghtaling if he "ever discuss[ed] the last one

with [Mr. Patel]."  Mr. Houghtaling told the colleague he had spoken to Mr. Patel and that Mr.

Patel "said he'd talk to Parametric Solutions about it."  Mr. Houghtaling then emailed Mr. Patel

that Belcan was "losing another employee to [Parametric Solutions]," and named the employee.

47.      A few months later, the situation was reversed:  In November 2016, Mr. Prus of

Parametric Solutions emailed Mr. Patel that Belcan was "actively [r]ecruiting [Parametric

Solutions] employees."  Mr. Patel forwarded Mr. Prus's email to Mr. Houghtaling and another

Belcan manager, saying that "[w]e must not poach each other partners['] employee.  Please

communicate to [Belcan] HR not to interview or hire active employees working on Pratt & Whitney work."  DOJ Aff. ¶ 27.

48.    As another example, in a February 2017 email, Mr. Wasan of QuEST responded to the news that Belcan had made an employment offer to a QuEST engineer by stating "[Belcan] is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh [Patel] today."  Mr. Wasan immediately forwarded the information about Belcan's offer to Mr. Patel, stating that "I am very concerned that [Belcan] believes they can hire any of our employees. . . .  Could you please stop this person from being hired by [Belcan]?"  DOJ Aff. ¶ 28.

49.    Pratt & Whitney also enforced the conspiracy by requiring applicants for engineering positions to disclose whether they worked for any company that did outsourcing work for Pratt & Whitney.  Pratt & Whitney refused to hire any applicant who worked for one of the Supplier Defendants.

50.    Pratt & Whitney also threatened to cut Defendants off from Pratt & Whitney's business if they violated the agreement.  For example, a June 2018 series of internal emails shows that after QuEST complained to Pratt & Whitney about Belcan's offer of employment to a QuEST engineer, Pratt & Whitney "threatened to pull all POs from [Belcan]" if Belcan hired the employee.  The next day, a Belcan employee emailed Mr. Patel that, "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" that engineer.  DOJ Aff. ¶ 33.

51.    In addition to using Mr. Patel as a conduit, the Supplier Defendants also discussed the no-poach agreement directly with each other.  For example, in a September 2019 email between Mr. O'Neill of Agilis and Mr. Edwards of Cyient, Mr. Edwards asked Mr. O'Neill to

stop "actively recruiting" Cyient employees.  Mr. O'Neill responded by confirming to Mr. Edwards that Agilis's "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get[s] unstable, and our margins all get hurt."  Mr. Edwards thanked Mr. O'Neill and added, to reinforce the quid-pro-quo nature of the conspiracy, that "I flat out ask our teams not to hire people from the other Pratt & Whitney suppliers."  DOJ Aff. ¶ 34.

52.     Defendants were aware of the illegality of their conduct, but that did not stop them.  As early as January 2016, managers and executives at Belcan discussed the fact that no-hire agreements between competitors violate antitrust laws.  A later email showed Belcan's Mr. Houghtaling planning a meeting with Mr. Patel with an agenda item, "Informal poaching agreement between outsource suppliers.  Recent Apple lawsuit because these agreements are illegal."  In a separate email thread Mr. Houghtaling expressed concern about the agreements, stating, "[Pratt & Whitney] (Mr. Patel) is asking (insisting) that we not interview anyone currently employed by our competitors . . . .  I'm not sure if this is legal, but that is what they are requesting we do."  The next day, Belcan's Human Resources Director conveyed that she and another Belcan manager "spoke with Mahesh this afternoon.  He understands our concern with antitrust compliance [sic], however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors."  DOJ Aff. ¶¶ 35-37.  Defendants nevertheless continued to conspire.

53.     The DOJ's investigation uncovered "no evidence" that Mr. Patel or the supplier Defendants ended their conspiracy after the incidents described.  DOJ Aff. ¶ 39.

C.     **The Conspiracy to Further Restrict Hiring and Recruiting Between Pratt & Whitney and QuEST**

54.     As part of the overarching no-poach agreement, Pratt & Whitney and QuEST had specific arrangements that reinforced and restrained competition in the market for engineers and other skilled employees.  These included (1) a two-year tenure restriction and (2) hiring freezes.

1.     *Pratt & Whitney agreed not to recruit or hire QuEST employees until they had worked for QuEST for at least two years.*

55.     The two-year tenure agreement was formed in 2011.  In September 2011, Mr. Harvey of QuEST and another person with knowledge attended a dinner with Mr. Patel and a Pratt & Whitney Vice President to whom Mr. Patel directly reported.  The next day, Mr. Harvey of QuEST emailed the dinner group and said, "We truly appreciate and value our strategic relationship. . . .  I thought I would take the lead in summarizing what we discussed last night and proposed next steps . . . ."  The first item in the summary was called "Personnel Transfers," which Mr. Harvey described as the set of "new policy/guidelines" that the Pratt & Whitney Vice President had reviewed at the dinner, and which outlined a requirement for a "min. 24 months" for such "Personnel Transfers."  Consistent with their efforts to keep their unlawful conduct secret, Mr. Harvey noted that Mr. Patel had advised to minimize the written record on that issue: "Following Mahesh's previous counsel, I am not going into detail in writing on this subject." DOJ Aff. ¶ 42.

56.     In late 2011, Mr. Harvey and other managers and QuEST executives and managers periodically communicated with Mr. Patel and other Pratt & Whitney employees to maintain and enforce this agreement.  DOJ Aff. ¶ 43.

57.     As an example, in October 2012, after receiving a voicemail from Mr. Patel, a person with knowledge of the conspiracy emailed Mr. Patel: "[Employee]'s tenure at [QuEST]

17

dates to May 2011.  Based on our agreement of two year minimum tenure, we would ask that [Pratt & Whitney] not pursue employment of [him] at this time."  DOJ Aff. ¶ 44.

58.     In June 2015, Mr. Patel emailed Mr. Wasan of QuEST and two other QuEST managers, stating that Pratt & Whitney "is interested in interviewing and hiring" two QuEST employees, "[p]lease provide your concurrence." One of the QuEST managers told Mr. Patel that one of the employees had worked at QuEST for four and a half years, and thus "meets requirements," but the other "only has 8 months and does not meet obligation, so [QuEST] cannot provide concurrence."  DOJ Aff. ¶ 45.

59.     As yet another example, in April 2017, one QuEST manager emailed another QuEST manager that he had received a notice from Pratt & Whitney that it wanted to hire a QuEST employee but the employee "wouldn't meet our requirements for two years."  The same manager then emailed Mr. Patel that the employee "does not meet tenure requirements."  Mr. Patel then told a Pratt & Whitney Human Resources employee: "[QuEST] will not release him. . . .  He has not completed 2 [y]ears as our verbal agreements."  DOJ Aff. ¶ 46.

### *2.     Pratt & Whitney and QuEST agreed on hiring freezes.*

60.     In furtherance of the conspiracy, from approximately 2015 through 2017, Patel and QuEST representatives also agreed to periods of time—from several months to nearly an entire year (2016)—during which Pratt & Whitney would not recruit or hire *any* QuEST employees, with only limited exceptions.  The companies referred to these periods as "freezes" or "moratoria."  DOJ Aff. ¶ 47.

61.     For example, in January 2016, Mr. Patel and Mr. Wasan of QuEST worked to establish a new hiring freeze for 2016.  Mr. Wasan sent an internal email stating that "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring.  Also I am going to tell him that he needs to block" two QuEST engineers "from being

hired until we come to an agreement on the acceptable limit to hire [from] our team."  DOJ Aff. ¶ 49.

62.     Mr. Patel enforced this agreement within Pratt & Whitney.  For example, in September 2017, Mr. Patel emailed Pratt & Whitney's Vice President of Human Resources-Engineering and told her to "direct your HR team not to hire [QuEST] outsource resources currently deployed on [Pratt & Whitney] projects till end of this year. . . .  [QuEST] senior leadership including CEO has repeatedly raised concerns on [Pratt & Whitney] hiring [QuEST] employees.  We will lift [QuEST] hiring restriction from Jan 1, 2018."  DOJ Aff. ¶ 50.

63.     This agreement was motivated by a shared desire to alleviate cost pressures on both companies.  By agreeing to restrict hiring of QuEST's employees, Pratt & Whitney helped keep QuEST's wages—and therefore its own costs—lower than they would have been in a competitive market.  The DOJ's investigation revealed that QuEST expressly appealed to this shared interest in keeping labor costs artificially low.  In June 2017, Mr. Harvey of QuEST proposed to Pratt & Whitney's parent company a "partnership approach on how we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services[.]"  DOJ Aff. ¶ 52.  In the attached presentation, Mr. Harvey asked for additional hiring restrictions between the two companies, given that "[w]e have found that customer hiring of our resources puts pressure on [QuEST]'s and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time."  *Id.*

### D.     The Effects of the No-Poach Conspiracy

64.     Defendants' conspiracy suppressed the compensation (including salaries, wages, and benefits) offered and paid to their employees while restricting the employment opportunities available to them.

65.     All Defendants competed for a limited supply of qualified aerospace engineers and skilled workers.

66.     Absent the conspiracy, Defendants would compete to recruit, hire, and retain top aerospace engineers and skilled workers, including by directly soliciting competitors' employees with better offers.

67.     Normal labor market competition would lead to upward pressure on compensation as firms sought to lure top talent away from their competitors while ensuring their current employees rejected any outside solicitation.  In other words, according to the Antitrust Guidance For Human Resource Professionals issued by the DOJ's Antitrust Division and the Federal Trade Commission, "competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment."[13]  Conversely, "[r]obbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment."[14]

68.     Defendants conspired to harm their employees by pledging not to solicit or hire each other's workers.  Freedom from competition allowed Defendants to pay their employees less than they would have been paid in a competitive market.  No-poach agreements like these "enable[] employers to avoid competing over wages and other terms of employment offered to

---

[13]   U.S. Dep't of Justice, *Antitrust Guidance for Human Resource Professionals* at 2 (2016), https://www.justice.gov/atr/file/903511/download.https://www.justice.gov/atr/file/903511/download.

[14]   U.S. Dep't of Justice, Division Update Spring 2018 (2018), https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements (last visited Jan. 12, 2022).

the affected employees" and prevent employees from "reap[ing] the benefits of competition among those employers that may result in higher wages or better terms of employment."[15]

69.     Defendants' conspiracy cut off the free flow of information within the aerospace engineering labor market, allowing Defendants to keep costs down by obscuring or eliminating the availability of better opportunities elsewhere.

70.     Direct solicitation from competing employers benefits individual employees because competing employers may make offers that exceed an employee's current compensation. That employee can then secure additional compensation by either changing employers or negotiating increased compensation from her current employer.  In addition, employees often share information about offers, which can empower other employees to negotiate with their employers or seek similar or better terms from their current employers.

71.     Defendants' conspiracy also cut off the free flow of information to employers who might otherwise have increased compensation to compete in the labor market.  Firms that directly solicit competitors' employees will learn whether their offered compensation is sufficient to lure its competitors' employees or not, and they are likely to increase compensation offers to ensure they remain competitive.  Similarly, firms that learn that their compensation is lower than competitors may preemptively increase compensation in order to avoid losing employees to poaching.

72.     Defendants' conspiracy successfully controlled labor costs by stifling competition for engineering and other skilled labor, suppressing compensation to their employees, and restricting the free movement of those employees by eliminating new employment opportunities.

_____

[15]   Corrected Statement of Interest of the United States of America at 10, *Stigar v. Dough Dough, Inc. et al.,* No. 2:18-cv-00244-SAB (E.D. Wash. Mar. 18, 2019) (Dkt. 34).

## II.   EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT

73.   Defendants actively and effectively concealed their collusion, as alleged herein, from Plaintiffs and the Class.  As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiffs' and the Class's claims have been tolled.

74.   As explained above, Defendants used various methods to conceal their conspiracy, including by conducting in-person meetings among the conspirators, and attempting to minimize the written record of their agreements.  For example, in December 15, Pratt & Whitney held a dinner attended by Mr. Patel and representatives from several other Defendants, including Mr. Wasan and Mr. Edwards.  At the dinner, Mr. Patel told the other attendees they should not poach each other's employees.  DOJ Aff ¶ 25.

75.   After another dinner meeting at which Defendants discussed their no-poach agreement, Mr. Harvey stated that Mr. Patel had advised the attendees to minimize the written record of their discussion, writing "Following Mahesh [Patel]'s previous counsel, I am not going into detail in writing on this subject."  DOJ Aff. ¶ 42.

76.   While Defendants concealed their unlawful agreement, they simultaneously misrepresented to Plaintiffs and the Class that they were abiding by antitrust and fair competition laws.  For example, Raytheon Technologies Corporation, the parent company of Pratt & Whitney, states in its Code of Conduct that "anti-competitive activities are always a violation of our values."[16]

---

[16]   Raytheon Technologies, Code of Conduct (2020), https://www.rtx.com//media/project/united-technologies/rtx/home/our-company/ethics-and-compliance/media/rtx-code-of-conduct-english.pdf?rev=1cb38b3fe62c4ca4a8ff92cc24108ac3.  United Technologies Corporation—Pratt & Whitney's parent corporation prior to the formation of Raytheon Technologies Corporation through the April 2020 merger of United Technologies Corporation and Raytheon Co.—had a similar policy in its Code of Conduct:  "[A]nti-competitive activities are always a violation of our core values.  They can also result in severe civil or criminal penalties for companies and individuals.  We compete vigorously and legally, not only because it's good for our business and

77.     Similarly, in its Code of Conduct, QuEST states that "anti-competitive activity will not be tolerated."[17]

78.     Belcan's Code of Conduct "requires and expects everyone to conduct business fairly, impartially, and *in full compliance with all laws and regulations*" (emphasis added).[18]

79.     Cyient has a similar policy outlined in its Code of Conduct.  It states that "Directors and Senior Management personnel shall avoid actions that could reasonably be construed as being anti-competitive, monopolistic or otherwise contrary to laws governing competitive practices in the marketplace, including antitrust laws."[19]

80.     It was reasonable for Plaintiffs and the Class to believe that Defendants were enforcing and abiding by these codes of conduct and the policies stated therein.

81.     Defendants' active concealment of their conspiracy did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that Defendants conspired to restrict competition for Class members' services through anti-solicitation agreements.  Given Defendants' concealment and misrepresentations, Plaintiffs and the Class could not have discovered the conspiracy until December 2021, when the DOJ's complaint was made public. Prior to December 2021, Plaintiffs and the Class reasonably considered the aerospace engineering industry to be competitive, and no reasonable person under the circumstances would

---

reputation, but because it's the right thing to do."  United Technologies, United by Values, https://www.rtx.com/-/media/project/united-technologies/utc/files/code-of-ethics/coe_us_text_doc_final_english.pdf .

[17]   QuEST Global Inc., QuEST Code of Conduct (Sept. 2020), https://3fee7a1sld751eqr jr3a035t-wpengine.netdna-ssl.com/wp-content/uploads/2021/08/Code-of-Conduct-Brochure-v4-Sep-2020.pdf .

[18]   Belcan, Code of Conduct (2019), https://www.belcan.com/about/corporate-beliefs/.

[19]   Cyient, Code of Conduct (Apr. 15, 2016), https://www.cyient.com/hubfs/5724847/ FY_19_Revamp_Assets_Website/Investors%20/Corporate%20Governance/Code_of_Conduct_1 50416_edited.pdf.

have had reason to begin to investigate the legitimacy of wages, salaries, or benefits paid by Defendants to engineers and other skilled workers in the United States.

82.     The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Class because they related to potential employment opportunities and increases in compensation.

83.     Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class have been tolled during the period of concealment.

## III.    CLASS ACTION ALLEGATIONS

84.     Plaintiffs, on behalf of themselves and those similarly situated, seek damages against Defendants based on the allegations contained herein.

85.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  The Class is defined as:

> All persons employed by Pratt & Whitney, QuEST, Belcan, Cyient, Parametric Solutions, Agilis, or their wholly-owned subsidiaries as engineers or other skilled employees at any time from 2011 through the present (the "Class Period"). Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States government.

86.     ***Numerosity***.  Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class but believe that there are thousands of Class members geographically dispersed throughout the United States.  Moreover, given the costs of complex antitrust litigation, it would be uneconomical for many plaintiffs to bring individual claims and join them together.  The Class is readily identifiable.

87.     *Typicality*.  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

88.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving their own claims, Plaintiffs will prove other Class members' claims as well.

89.     *Adequacy of Representation*.  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and in the representation of individual employees and groups of employees.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

90.     *Commonality*.  There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)     Whether Defendants entered into a no-poach agreement to restrict competition in the labor market in which Plaintiffs and the other Class members sold their services;

(b)     the identity of the participants in the conspiracy;

(c)     the duration of the conspiracy;

(d)     the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)      whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Class;

(f)      whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Class;

(g)      whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

(h)      the appropriate injunctive and equitable relief for the Class.

91.      ***Predominance***.  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

92.      ***Superiority***.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in managing this class action.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

93.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIM FOR RELIEF

### (Conspiracy to Restrain Trade in Violation of §1 of the Sherman Act, 15 U.S.C. § 1)

94.     Plaintiffs incorporate the preceding paragraphs by reference.

95.     Defendants knowingly, intentionally, and cooperatively engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Specifically, Defendants agreed to restrict competition for Class members' services through a no-poach agreement with the purpose and effect of suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

96.     Defendants' conduct injured Plaintiffs and other Class members by depriving them of free and fair competition in the market for their services.

97.     Defendants' no-poach agreement is a *per se* violations of Section 1 of the Sherman Act.

98.     As a direct and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and the Class have received compensation that is less than they would have received had the market for their services been competitive.

## PRAYER FOR RELIEF

99.     WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

(a)     Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3); direct that reasonable notice of this action, as

provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class; declare Plaintiffs as the representatives of the Class; and designate undersigned counsel as counsel for the Class.

(b)    Adjudge and decree that the unlawful conduct alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c)    Permanently enjoin and restrain Defendants from continuing and maintaining the conspiracy alleged in the Complaint under Section 16 of the Clayton Act, 15 U.S.C. § 26;

(d)    Award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15, plus interest;

(e)    Award reasonable attorneys' fees and costs;

(f)    Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action; and

(g)    Direct such further relief it may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED:   New Haven, Connecticut
January 13, 2021

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFFS**

by:    GARRISON, LEVIN-EPSTEIN,
       FITZGERALD & PIRROTTI, P.C.

  */s/ Joshua R. Goodbaum*
Joseph D. Garrison (ct04132)
Stephen J. Fitzgerald (ct22939)
Joshua R. Goodbaum (ct28834)
Amanda M. DeMatteis (ct29413)
405 Orange Street
New Haven, Connecticut, 06511
Telephone:  (203) 777-4425
Fax:  (203) 776-3965
jgarrison@garrisonlaw.com
sfitzgerald@garrisonlaw.com
jgoodbaum@garrisonlaw.com
adematteis@garrisonlaw.com

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

Daniel L. Brockett (*pro hac vice to be filed*)
Steig D. Olson (*pro hac vice to be filed*)
Manisha M. Sheth (*pro hac vice to be filed*)
Thomas Lepri (*pro hac vice to be filed*)
Casey Adams (*pro hac vice to be filed*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
steigolson@quinnemanuel.com
manishasheth@quinnemanuel.com
thomaslepri@quinnemanuel.com
caseyadams@quinnemanuel.com

*Counsel for the Plaintiffs*